UNITED STATES of America, Plaintiff,

v.

John M. MIKOLAITIS, and Antoinette M. Mikolaitis, Defendants.

Civ. A. No. 87–1376.

United States District Court,
M.D. Pennsylvania.

Jan. 26, 1988.

James J. West, Acting U.S. Atty. by James A. Gibbons, Asst. U.S. Atty., Scranton, Pa., for plaintiff.

John C. Aciukewicz, Legal Services of N.E.Pa., Inc., Wilkes–Barre, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

I. *Introduction.*

Defendants, John M. Mikolaitis and Antoinette M. Mikolaitis, have moved to dismiss plaintiff's complaint for lack of subject matter jurisdiction pursuant to Fed.R. Civ.P. 12(b)(1). Plaintiff, United States of America, filed this action on behalf of the Farmers Home Administration (FmHA) to foreclose on two mortgages FmHA has on the defendants' residence. Defendants contend that FmHA's failure to comply with two Pennsylvania laws, Act No. 1983–91, 35 P.S. § 1680.401c, *et seq.* (Act 91) and Act No. 1974–6, 41 P.S. § 101 *et seq.* (Act 6), both relating to pre-foreclosure notice

requirements, divests us of jurisdiction to entertain the government's suit.[1]

## II. *Background.*

The complaint alleges that defendants obtained two loans from FmHA and executed the two mortgages as security for them on July 27, 1979 and April 7, 1983, respectively, that defendants defaulted by failing to pay their monthly payments and real estate taxes, and that plaintiff has complied with the conditions precedent for bringing the action set forth in 7 CFR § 1951.313(b). The plaintiff also alleges that it complied with Act 6 by sending separate notices to each defendant, dated April 22, 1986, setting forth its intention to foreclose on the mortgages. These notices also advised defendants of certain rights they had under federal regulations before foreclosure could take place. Thus, defendants were informed foreclosure would not take place for thirty days from the date of the notice and that during this time defendants could request a hearing if they believed that the government was in error in seeking foreclosure or that they had not been advised of their rights to seek interest credit assistance or a moratorium on payments. The notices also advised defendants that they could cure their default, and stop the foreclosure, in several ways; first, by paying the total amount of their delinquency plus certain costs; second, by transferring the mortgages to another person who would be responsible for curing the default or; third, by refinancing the mortgages by borrowing from another lender the entire amount needed to pay the debt in full. Default could also be cured by conveying clear title of the mortgaged property to the United States acting through FmHA.

As referred to in the notices, the regulations authorize a moratorium on principal and interest payments. This information, along with other avenues of assistance, was allegedly imparted to the borrower at the time of the application for the loan. *See* 7 CFR § 1944.26(d).[2] Section 1951.-313(a) provides that when, due to circumstances beyond a borrower's control, a borrower is unable to continue scheduled payments without unduly impairing his or her standard of living, the borrower can obtain a moratorium on payments. A moratorium on principal and interest payments can last for six months at a time with extensions up to three years. *Id.* at § 1951.313(b)(4), (5). A borrower can also obtain interest credit assistance. *Id.* at § 1951.312(b), 1944.34.

In addition to the above regulations, dealing specifically with pre-foreclosure mortgage procedures, the following general regulation also applies. Captioned "Applicable law," 7 C.F.R. § 1900.102, provides, in pertinent part, as follows:

Loans made by FmHA are authorized and executed pursuant to Federal programs adopted by Congress to achieve national purposes of the U.S. Government.

(a) Instruments evidencing or securing a loan payable to or held by the Farmers Home Administration, such as promissory notes, bonds, guaranty agreements, mortgages, deeds of trust, financing statement, security agreements, and other evidences of debt or security shall be construed and enforced in accordance with applicable Federal law.

. . . .

(c) In order to implement and facilitate these Federal loan programs, the application of local procedures, especially for recordation and notification purposes, may be utilized to the fullest extent feasible and practicable. However, the use of local procedures shall not be deemed or construed to be any waiver by FmHA of Federal immunity from any loan con-

---

**1.** The government's complaint cites as jurisdictional authority 28 U.S.C. § 1345, providing that the district courts "shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States. . . ." Therefore, we reject the contention that we lack subject matter jurisdiction. We believe that the

motion should really be considered as one to dismiss for failure to state a cause of action pursuant to Fed.R.Civ.P. 12(b)(6), and we will treat it as such.

**2.** We accept, for purposes of the motion, the allegations of the complaint.

trol, penalty, or liability, or to subject FmHA to any State required acts or actions subsequent to the delivery by FmHA officials of the instrument to the appropriate local or State official.

In the face of all of these provisions, defendants would have us require plaintiff comply with Pennsylvania law as well. We believe that plaintiff's notices did comply with the substantive provisions of Act 6.[3] We will therefore deal only with the requirements of Act 91.

The provisions of Act 91 parallel the procedures set forth in the FmHA notices to a great extent. Before a foreclosure action can be initiated, Act 91 requires contact within thirty days of the notice, either with the lender or a credit counselor, to work out a repayment plan or otherwise settle the delinquency. 35 P.S. §§ 1680.402c(b), 1680.403c (Purdon Supp.1987–88). If the borrower initiates such contact, no action can be taken for thirty days from the date of the meeting. If the default cannot be worked out within the next thirty days, the mortgagor may apply to the Homeowner's Emergency Mortgage Assistance Program, administered by the Pennsylvania Housing Finance Agency (PHFA). PHFA must make a determination of eligibility within sixty days of receipt of the application. During this time, foreclosure cannot occur. *Id.* at §§ 1680.402c(b), 1680.403c(b).

A borrower is eligible for assistance under the program if, in part, he or she has been in default for at least sixty days, cannot correct the default due to circumstances beyond his or her control, and there is a reasonable prospect that the borrower can resume full mortgage payments within thirty-six months of beginning to receive assistance under the program. *Id.* at § 1680.404c. If a borrower is eligible, PHFA cures his or her default and, if appropriate, makes monthly mortgage payments directly to the mortgagee. The borrower must make certain payments, based

upon financial ability, directly to the agency and the difference constitutes a loan repayable to PHFA. *Id.* at § 1680.405c.

### III. *Discussion.*

#### A. *Dunlap and Kimbell Analysis.*

Plaintiff relies upon our decision in *United States v. Royer*, —— F.Supp. ——, No. 82–1071 (M.D.Pa. July 16, 1986) (Caldwell, J.), *aff'd without opinion*, 815 F.2d 696 (3d Cir.1987), in opposing the motion to dismiss. In *Royer*, we concluded that pertinent provisions of the standard FmHA mortgage agreement required the application of federal law to the mortgage foreclosure at issue in that case. Hence, the government did not have to comply with Act 91 in foreclosing on the Royers' mortgage. The government also relies upon *United States v. Black*, 622 F.Supp. 669 (W.D.Pa.1985) in which the district court, relying upon a preemption analysis, similarly concluded that FmHA did not have to comply with state law in a mortgage foreclosure action.

Defendants counter with *United States v. Spears*, No. 85–3378 (E.D.Pa. Sept. 29, 1987), which, relying upon *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), concluded that FmHA had to comply with Acts 6 and 91 in foreclosing upon the borrowers' mortgage. Defendants distinguish *Royer* and *Black* because those cases did not undertake the *Kimbell*, three-part analysis, as the court in *Spears* did, to determine whether federal or state law should apply. We note that this issue was raised, at best, only obliquely in *Royer*. Defendants there concentrated upon the mortgage language, arguing only that FmHA had bound itself contractually to use Pennsylvania law. We therefore do not consider *Royer* conclusive upon our consideration of the issue raised by these defendants.[4] We will proceed to consideration of their argument.

---

**3.** We disagree with *Kennedy Mortgage Co. v. Washington*, 12 Pa.D. & C.3d 476 (Phila.Co. 1979), which held, in part, that Act 6 requires a mortgagee to include in the notice the number of months the mortgage was delinquent, the

only reason advanced by defendants here for attacking the sufficiency of the Act 6 notice.

**4.** Additionally, because the Third Circuit entered only an unpublished judgment order in *Royer*, its affirmance of our judgment has no

In making the argument that *Kimbell* should apply here, defendants apparently rely heavily upon the absence of a congressional directive. Their brief argues that "[w]hen the United States is a party *and no Act of Congress is involved,* the Federal Courts have developed the standards that govern whether State or Federal law should apply in a particular instance.... The clearest and most recent exposition of these standards is found in *United States v. Kimbell Foods, Inc.,....*" (defendants' brief at p. 3) (citations omitted) (emphasis added). The brief then goes on to argue that the *Kimbell* analysis results in the application of state law here and ignores the extensive federal regulations promulgated by FmHA.

This approach has gained acceptance in the Third Circuit. In *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232 (3d Cir.1986), the Third Circuit, deciding the status of a FmHA lien on collateral for a loan, faced a choice between applying a federal regulation or using Pennsylvania law. Prefacing its discussion by concluding that *Kimbell* required the issue to be decided as a matter of federal law, the court stated:

Even if the regulation were considered as substantive it nevertheless would not be entitled to be treated as applicable "law." Substantive regulations affect individual rights and obligations but do not without more have the "force and effect of law." *Chrysler Corp. v. Brown,* 441 U.S. [281] at 302, 99 S.Ct. [1705] at 1718 [60 L.Ed.2d 208 (1979)]. For that to occur, "it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress." *Id.* at 304, 99 S.Ct. at 1719.

It may be seen that by prescribing restricted application of the proceeds before the lien is released, even though the sale was approved, FmHA attempts to impose a burden on the purchaser be-

yond that required under state law. No federal statutory source is cited for this additional dictate, and the regulation appears to be an agency creation aimed solely at increasing the government's collection efficiency.

*Id.* at 1238.

The court further stated:

*Kimbell's* holding is in effect a finding that in the area of federal lending programs regulations such as 7 C.F.R. § 1962.18(b) (1985), enacted under a general enabling provision, do not constitute the sort of explicit "congressional directive" that will displace the application of state law as the federal rule of decision. The FmHA regulation is not a "congressional directive," nor is there any evidence that it represents congressional policy. We therefore must heed *Kimbell's* direction to "adopt the ready made body of state law as the federal rule of decision until Congress strikes a different accommodation." 440 U.S. at 740, 99 S.Ct. at 1464.

*Id.* at 1239.

■ As already noted, FmHA requires the mortgages at issue here to be construed and enforced in accordance with applicable federal law. 7 CFR § 1900.102(a). FmHA regulations also specifically provide that, while FmHA may utilize local law dealing with recordation and notification procedures, such law shall not be construed to require FmHA to perform any state required acts on actions subsequent to delivery of the instruments, here mortgages, to appropriate local or state officials. *Id.* at § 1900.102(c). The latter provision would seem to preclude requiring the government to send an Act 91 notice. The regulation, like the others cited above, was enacted pursuant to Congress's general grant of authority to the Secretary of Agriculture to "make such rules and regulations as he deems necessary to carry out the purposes of this subchapter." 42 U.S.C. § 1480(k).[5] *See also* 7 U.S.C. § 1989.

precedential value and therefore does not control our disposition of this case. *See In re Reading Co.,* 524 F.2d 324, 326 n. 1 (3d Cir.

1975). *See also* Third Circuit IOP Chapter 6. Judgment Orders.

5. This authority was apparently delegated further. *See* 7 C.F.R. §§ 2.7, 2.23(2). 42 U.S.C.

But *Dunlap* holds that such a regulation, "enacted under a general enabling provision," does not "constitute the sort of explicit 'congressional directive' that will displace the application of state law as the federal rule of decision." *Dunlap, supra,* 800 F.2d at 1239. Accordingly, we must use the *Kimbell* analysis to determine if we should apply federal or state law. That analysis looks at the following factors: (1) the need for a nationally uniform body of law; (2) whether state law would frustrate specific objectives of the federal program; and (3) whether a federal rule would frustrate commercial relationships predicated upon state law.

There is no need for a nationally uniform body of law. FmHA already relies upon state foreclosure laws and can comply with other state laws bearing on foreclosure. The regulations specifically recognize the possibility of using state law. 7 C.F.R. § 1900.102(c). In fact, requiring FmHA to comply with Act 91 would have a minimal effect upon the FmHA pre-foreclosure practices. As shown above, FmHA already will meet with borrowers to explore other avenues of financing before foreclosing. Presumably, if it appears that alternative financing would be forthcoming, FmHA would forebear on foreclosing until that option is explored. Moreover, certain qualified borrowers are allowed a moratorium on principal and interest payments, possibly up to three years. FmHA could certainly, within this time frame, advise borrowers of the state emergency mortgage assistance program and permit them to seek assistance from the state. If such an application was made, it would, at most, add three to four months to the foreclosure process.[6]

It follows from the above that state law would not frustrate specific objectives of the federal program. It could be argued as plaintiff did in the *Royer* case, that Act 91 would frustrate FmHA's ability to foreclose on its mortgages and jeopardize its ability to recover its funds. We recognize, of course, that protection of the public treasury is always a concern in government funding programs, see *Black, supra,* 622 F.Supp. at 673, but Act 91 does not frustrate that interest. Indeed, it protects it by giving the borrower an additional source of financing. When FmHA has expressed a willingness to put off payment of principal and interest for possibly three years, a state law which would possibly provide a source for those payments for the same period of time and, moreover, transfer the debt from FmHA to the state for those years, hardly qualifies as a conflicting state law which should not be enforced against the agency.

Finally, using the FmHA regulations would frustrate commercial relationships predicated upon state law. "*Kimbell's* holding and rationale rest on the underlying premise that Congress 'did not intend to confer special privileges on agencies that enter the commercial field.'" *Dunlap, supra,* 800 F.2d at 1238 (quoting *Kimbell,* 440 U.S. at 737, 99 S.Ct. at 1463, 59 L.Ed.2d at 730). Defendants may therefore justifiably expect to see state law enforced.

We therefore conclude that *Kimbell,* in light of *Dunlap,* requires the application of state law to this mortgage foreclosure action. Accordingly, plaintiff must comply with Act 91.

### B. *Shimer and de la Cuesta Analysis.*

We note here an alternative approach to defendants' motion which reaches the same result. Unlike the above analysis, it does not rely upon the absence of an explicit congressional directive to preempt state law in requiring compliance with state law.

In *United States v. Shimer,* 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961), the Veterans' Administration brought an action

---

§ 1475, dealing with moratoriums on loan payments, may be seen as an explicit grant of authority in that area.

**6.** We note that in this action, FmHA's notices of delinquency list the total amount of overdue payments on both mortgages as $4501.41. The total monthly principal payments due on both mortgages was $288. Hence, FmHA waited approximately a year after default before seeking foreclosure.

against Shimer, a veteran, to recover on its partial guaranty of a loan made by a loan association to the veteran for the total purchase price of a residence. Shimer had defaulted on the loan, secured by a mortgage on the residence, and the loan association had foreclosed on the mortgage under Pennsylvania law. The association purchased the house at a sheriff's sale for a minimal amount of money and the agency paid it the entire amount of the guaranty. The association, however, had failed, as further required by Pennsylvania law, to seek a judicial determination of the fair market value of the property within six months of the sale. Accordingly, it could not have obtained a deficiency judgment against the borrower. The agency's claim was based upon a right of indemnity for having paid Shimer's obligation to the association. This theory was rejected in the court of appeals because Shimer's obligation to the association had been extinguished by the latter's failure to obtain a deficiency judgment against him in accordance with state law. Since, under Pennsylvania law, a guarantor, the agency, could not recover sums paid on behalf of a principal, the borrower, that the principal was not legally obligated to pay, the agency's claim was rejected.

On appeal, the Supreme Court concluded that state law was not applicable. It first decided that the detailed regulations promulgated by the Veterans' Administration dealing with the agency's obligation as a guarantor, although intended to remedy the same abuses, were intended to displace state law and were inconsistent with it. The Court then concluded that the Servicemen's Readjustment Act of 1944, the enabling legislation, authorized the agency head to promulgate the regulations at issue. It cited section 504 of the legislation which read, in pertinent part, as follows: "The Administrator is authorized to promulgate such rules and regulations not inconsistent with this title, as amended, as are necessary and appropriate for carrying out the provisions of this title...." *Id.* at 382, n. 9, 81 S.Ct. at 1560 n. 9, 6 L.Ed.2d at 914 n. 9. The Court then stated:

It would, of course, have been possible for the Administrator to have promulgated regulations consistent with much of the present scheme which would have, in addition, accepted the benefits of local law which tended further to reduce a guarantor's risk of loss from sale of the mortgaged property at an inadequate price.... However, the Veterans' Administrator has chosen not to take advantage of laws like that of Pennsylvania. If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Id.* at 382–83, 81 S.Ct. at 1560, 6 L.Ed.2d at 914–15.

The choice did represent a reasonable accommodation of two conflicting policies committed to the agency's care: (1) making a federal guaranty the substantial equivalent of a down payment and (2) protecting the agency and the veteran from unnecessary loss on a foreclosure sale. Further, nothing in the statute or legislative history was antagonistic to this choice. Finally, the Court noted that applying Pennsylvania on top of the federal regulations would have imposed additional costs and risks on a mortgagee which would not have been inclined under those circumstances to provide a guaranteed 100% loan in place of a down payment.

It would therefore appear that, in the instant case, the absence of a specific congressional directive is immaterial to applying federal law since in *Shimer* the Supreme Court looked to agency regulations promulgated only by virtue of a general enabling provision.

*Shimer* could be distinguished because the Court also found that there were "ample indications both in the Act and in its legislative history that Congress intended the guaranty provisions to operate as the substantial equivalent of a down payment...." *Id.* at 383, 81 S.Ct. at 1561, 6 L.Ed.2d at 915. This could supply the re-

quisite congressional directive. But such a finding was not important to the Court in *Fidelity Federal Savings And Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), involving a challenge to a regulation of the Federal Home Loan Bank Board (Board) permitting federal savings and loan associations to enforce due-on-sale clauses in their mortgages.[7] In that case, a federal savings and loan association had deeds of trust containing such a clause on properties in California where the use of a due-on-sale clause was prohibited. Purchasers of the properties sought to enjoin non-judicial foreclosure proceedings brought by the association when the purchasers resisted attempts to raise the mortgage rates. After prevailing in the state trial court, the savings association lost in the state court of appeals which found, in part, that the federal regulation, despite containing explicit language concerning the Board's intention to preempt state law, did not do so because the court "refused to 'equate the *Board's* expression of intent with the requisite *congressional* intent.'" *Id.* at 150, 102 S.Ct. at 3020–21, 73 L.Ed.2d at 673 (quoting 121 Cal.App.3d 328, 339, 175 Cal.Rptr. 467, 474 (1981)) (state court emphasis). Rejecting this argument, the Court stated:

> A pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover, whether the administrator failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive. See *United States v Shimer,* 367 US, at 381–383, 6 L Ed 2d 908, 81 S Ct 1554. Thus, the Court of Appeal's narrow focus on Congress' intent to supersede state law was misdirected. Rather, the questions upon which resolution of this case rests are whether the Board meant to preempt California's due-on-sale law, and, if so,

whether that action is within the scope of the Board's delegated authority. *Id.* at 154, 102 S.Ct. at 3023, 73 L.Ed.2d at 676.

The Court concluded that the regulation was within the scope of the Board's delegated authority. It examined the legislative history of the Board's enabling act, the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. § 1461 *et seq.,* and determined that its purpose was to provide emergency mortgage assistance but by way of savings and loan associations regulated by the federal government to ensure their vitality in financing home ownership. Moreover, the Board was to be free to depart from state law in establishing regulations. This legislative history was consistent with the "plenary authority" conferred upon the Board by section 5(a) of the Act to promulgate regulations to carry out the purpose of the Act. That section authorizes the Board "under such rules and regulations as it may prescribe, to provide for the organization ... operation, and regulation" of federal savings and loan associations, "giving primary consideration to the best practices of local mutual thrift and home-financing institutions...." *See* 12 U.S.C. § 1464(a). Accordingly, the due-on-sale regulation was a proper exercise of the Board's power despite the absence of explicit congressional direction to adopt such a regulation.[8] It was also a reasonable exercise of power, regulating federal savings and loans "to ensure that they would remain financially sound institutions able to supply financing for home construction and purchase." *Id.* at 168, 102 S.Ct. at 3030, 73 L.Ed.2d at 684.

In the instant case, it would therefore appear that FmHA acted within its sphere of authority in enacting regulations requiring its mortgage agreements to be construed "in accordance with applicable Federal law," 7 C.F.R. § 1900.102(a), and ex-

---

7. A due-on-sale clause permits a lender to accelerate remaining payments due on a mortgage if the property securing the loan is sold or transferred.

8. In reaching its conclusion, the Court also emphasized the statutory option given the Board to

give "consideration" to the practices of local institutions but that factor does not affect the relevancy of *de la Cuesta* to this action. *See Conference of State Bank Supervisors v. Conover,* 710 F.2d 878 (D.C.Cir.1983) (per curiam).

empting FmHA from any local control or subjecting it to any state required acts or actions subsequent to the recording of the mortgages. *Id.* at § 1900.102(c). For, as already noted, the Secretary of Agriculture has been granted similarly broad authority as the Board in 42 U.S.C. § 1480 and 7 U.S.C. § 1989. *See also Dunlap, supra,* 800 F.2d 1243 (Adams, J., concurring) (citation omitted): "It would be a novel approach to administrative law to suggest that the courts may declare certain subject areas of federal legislation to be for Congress alone absent a specific congressional mandate, thereby not only constraining improper judicial legislating but also vitiating, as to such subjects, proper general enabling provisions."

This conclusion, however, does not end our inquiry. We must also determine whether the agency acted arbitrarily, unreasonably or inconsistently with the underlying statute. *See de la Cuesta, supra,* 468 U.S. at 153–54, 102 S.Ct. at 3023, 73 L.Ed.2d at 675–76. Unlike the situation in *de la Cuesta,* we do not believe FmHA's action is reasonable, or consistent with the underlying statute. As defendants have argued, within the context of the pre-foreclosure proceedings contemplated by FmHA's detailed regulations, compliance with Act 91 "is not burdensome" and could be done "without any great administrative difficulty." (defendants' brief at p. 5).[9] Moreover, it would serve FmHA's stated policy of insuring that all authorities are considered in helping borrowers remain homeowners and reducing the number of borrower failures. *See* 7 CFR § 1951.301. Further, it would also protect the federal funds involved in FmHA's loan program. *See Black, supra.* In sum, FmHA's refusal to adopt state law was arbitrary and unreasonable and its regulations in this area cannot be enforced.

We will accordingly require plaintiff to issue an Act 91 notice *nunc pro tunc* within thirty days of the date of the accompanying order. We will also stay foreclosure until all the requirements of Act 91 have been complied with. If plaintiff fails to serve the notice, this action will be dismissed.

---

9. Plaintiff did not address this issue specifically in its brief, relying instead simply upon our previous decision in *Royer.* We note, however, that the government did deal with this issue in *Royer,* arguing there conclusively that forcing it to comply with state law would "frustrate the FmHA's ability to foreclose on its mortgages in default," (government's *Royer* brief in support of motion for summary judgment at p. 11), and that Act 91's notice requirements would "jeopardize the Federal Government's ability to recover its funds." *Id.* at p. 12. Without further elaboration by the government, we reject these contentions.

Based upon *Shimer, supra,* it could be argued that the FmHA regulation represents a reasonable accommodation between the latter two goals and the apparently conflicting one of helping borrowers remain homeowners. *See* 7 C.F.R. § 1951.301. We think this would be a false conflict. First, efficient mortgage foreclosure should only serve the larger goal of maintaining the financial soundness of government lending programs. But the latter policy is not hampered by Act 91. Rather, it is served by that Act by insuring that the borrower has knowledge of a specific source of alternative financing. In any event, we do not believe that the regulation, if viewed as an apparently reasonable accommodation of conflicting policies, would have been sanctioned by Congress.